FUNCK and others, plaintiffs in error, agt. MERIAN & BENARD, defendants in error.

### Questions discussed.

1. Whether goods delivered into *public store,* on general order to discharge the ship, is a delivery to the *consignee ;* and such a receipt of the goods by the consignee, as binds him to pay the *freight ?*

2. Where the consignee endorses over the bills of lading, which are made payable to his order, and the assignee receives the goods—a portion from the ship, and the remainder from the public store ; whether the *consignee* is still liable to the ship owner or master for the payment of the freight, or whether the *assignee* only is responsible ?

THIS was an action of assumpsit brought in the superior court, by James Funck, Robert Carnley, Jacob A. Westervelt and Edward Boisgerard, against Jean J. Merian and Charles Benard, for payment of the following bills of freight, and which were the plaintiffs' bill of particulars, to wit :

" 1839, November 4.

To freight on 9 packages in the packet ship Baltimore, from Havre in France, to New-York, $114.56
Primage, 10 per cent. 11.46

" 1840, March 19.

To freight on 10 packages, in the packet ship Baltimore, from Havre in France, to New-York, 152.05
Primage, 10 per cent. 15.20

$293.27"

The defendants pleaded non-assumpsit. The cause was brought to trial on the 20th of October, 1842, at the City Hall, before Hon. SAMUEL JONES, chief justice.

It was admitted by the counsel of the respective parties, that the first nine bales specified in the bill of particulars, were received from the ship Baltimore, into public store, on a general order to discharge the ship, on the 11th of November, 1839 ; and were delivered therefrom to Mainon & Bonnay, on the

22d of February, 1840. And that five of the remaining ten bales, included and described in the bill of particulars, were received from ship Baltimore, into public store on like order, on the 26th of March, 1840 ; and delivered therefrom to Mainon & Bonnay, on the 22d of April, 1840. And that the other five bales were delivered from the ship to Mainon & Bonnay. And the whole nineteen bales received by them.

The following bills of lading, the translations thereof, and endorsements thereon, were also admitted ; and which translations and endorsements were as follows, to wit :

J. Funck, captain of the ship Baltimore, now at Havre, about to go with the first favorable wind to New-York, acknowledge to have received and laden on board my said ship, and under

M. B.          deck, for account of whom it may concern, from
71 *a* 79       you, M. J. Troussel, nine bales willow baskets,
               measuring together eighteen hundred thirty-two
               feet—8s.                                1832—8s.
               the whole dry and in good order, marked and
$114.54.        numbered as in the margin, which merchandize I
  11.46.        engage to carry and conduct in my said ship, the
  ———           dangers and perils of the sea excepted, to the said
$126.00        place of New-York, and there to deliver them to

Messrs. Merian & Benard, or to their order, on paying me for my freight two dollars and a half per ton of forty cubic feet, adding 10 per cent. primage. And to this effect, I bind myself, vessel and goods, with my said ship, freight and apparel as she now is. In testimony whereof, I have signed four bills of lading of one same tenor, one of which being accomplished, the others shall be of no effect.—Havre, the 24th September, 1839.

(Contents unknown to)

    (Endorsed.)

Deliver the within to Messrs. Mainon & Bonnay.

  New-York, 21st February, 1840.

MERIAN & BENARD.

J. Funck, captain of the ship Baltimore, now at Havre, about to go with the first favorable wind to New-York, ac-

knowledge to have received and laden on board my said ship, and under deck, for account of whom it may concern, from you, M. J. Troussel, nine bales willow baskets, measuring together nineteen hundred and twenty feet, eight inches, 1920—8s. One box do., measuring two hundred thirteen feet, four inches, 213—4s.

M. B. the whole dry and in good order, marked and
No. 10 a 18. numbered as in the margin, which merchandize I engage to carry in my said ship, (the dangers and perils of the sea excepted,) to the said place of
No. 19. New-York, and there to deliver them to Messrs. Merian & Benard, or to their order, on paying me for my freight two dollars and a half for the bales, and six dollars for the box, the ton of forty cubic feet, adding 10 per cent. primage.

$120.05 And to this effect, I bind myself, vessel and
32 goods, with my said ship, freight and apparel as she now is.

$152.05 In testimony whereof, I have signed four bills
15.21 of lading of the same tenor, one of which being accomplished, the others shall be of no effect.
$167.25 Havre, the 15th January, 1840.

(Contents not known to)
(Endorsed.)
Deliver the within to Messrs. Mainon & Bonnay.

MERIAN & BENARD.

It was also admitted, that the amount of the freight and interest accruing upon the merchandize, specified in the bill of particulars, is therein correctly stated.

The counsel for the plaintiffs then produced as a witness,— *Edward Hincken*, who, being sworn, testified that the plaintiffs are the owners of the ship Baltimore; that witness is a member of the firm of Boyd & Hincken, the agents of the Havre packets. That witness made out and caused to be presented to defendants, a bill of freight, for the goods specified in the bill of particulars; that this bill was included in a bill

for other goods received for the defendants by the same vessel. That the bills of freight were presented by their collector, Mr. Turneure, and that witness understood from Mr. Turneure, that the defendants had requested that a separate bill for these goods might be made out, and presented to Mainon & Bonnay. That witness did accordingly make out the bills separately, and gave them to the clerk to collect. That he does not re-collect any particular conversation with Mr. Merian respecting the bill ; that it was a very usual thing for witness to separate the bills upon the request of parties, and collect freight from others ; and that it was done more frequently for Merian & Benard, than any other house in New-York.

The counsel for the plaintiffs next produced as a witness,—

*William Turneure,* who, being sworn, testified that he is a clerk of Boyd & Hincken, and collects their freight bills ; that defendants received other goods by the same ship. One bill was made out against defendants for the freight of all the goods consigned to defendants in the ship, and witness called on defendants and left the bill. On calling the second time, witness was requested by Mr. Merian to make out a separate bill for the goods included in the bill of particulars of plaintiffs against Mainon & Bonnay. That such bills were made out by Mr. Hincken, and presented by witness, and that Mainon & Bonnay promised witness to pay them ; that thereupon bills were made out to defendants, for the balance of the goods by the same ship, of which bills the following are copies :

" New-York, Nov. 5, 1839.

Messrs. Merian & Benard :

To owners of packet ship Baltimore,

| | | | | | | |
|---|---|---|---|---|---|---|
| For freight of M. B., 225 packages nine 2,700 *a* $ 9 | | | | | | $67.50 |
| | 2 | do. | ft. | 367 *a* | 10 | 9.15 |
| | | | | | | 76.65 |
| Primage, 10 per cent. | | | | | | 7.67 |
| | | | | | | $84.32 |

Received payment,"

Funck and others *agt.* Merian & Benard.

"New-York, March 21, 1840.

Messrs. Merian & Benard:

To owners of packet ship Baltimore,

| For freight of A. H. 37-52 | 16 packgs., | ft. | 3,064 a $10 | $76.59 |
|---|---|---|---|---|
| H. A. 26-27 | 2 do. | do. | 24 a 12 | 7.20 |
| J. T. 27 | 1 do. | do. 226,11 a | 2½ | 14.20 |

|  |  |
|---|---|
|  | $97.99 |
| Primage, 10 per cent. | 9.80 |
|  | $107.79 |

Received payment,"

Witness further testified, that the following receipts were given for the said bills :

"New-York, Nov. 22d, 1839 :—Received from Merian & Benard, eighty-four, 32–100 dollars, for freight per ship Baltimore, from Havre.
[$84.32.]

BOYD & HINCKEN,
*per* WM. A. TURNEURE."

"New-York, April 3d, 1840 :—Received from Merian & Benard, one hundred seven 79–100 dollars, for freight per ship Baltimore, from Havre.
[$107.79.]

BOYD & HINCKEN,
*per* WM. A. TURNEURE."

Witness further testified, that bills were made out to Mainon & Bonnay, for the goods specified in the bill of particulars, and were frequently presented to them ; that they promised to pay, but postponed the payment from time to time, and that, finally, witness understood they had failed. To a question by a juror, Had Mainon & Bonnay stopped payment when you presented them the bill ? Witness answered " he did not know."

The saia plaintiffs thereupon rested.    Whereupon, the counsel for the defendants opened his defence to the jury, and called as a witness—

*Pierre Bonnay*, who, being sworn, testified that the goods referred to in the bill of particulars, were ordered and purchased by deponent's firm, Mainon & Bonnay, from a house in France; that the defendants had no interest whatever in them; that they were forwarded to witness' house through the defendants, in order that witness might settle the payment of the price of the goods; that this was the course which had always been adopted with respect to witness' goods coming through the hands of the defendants, and also through Mr. Boisgerard, one of the plaintiffs; that the invoice of the goods was always made out to Mainon & Bonnay, and the bill of lading was sent to the defendants or Mr. Boisgerard, to be transferred to the witness, upon a settlement for the price of the goods; that these goods were, as in the case of all others, entered, and the duties paid by witness; that witness has in all cases received from Boyd & Hincken, as agents for the Havre packets, the bills of freight for goods forwarded through the defendants, which he has paid, until these bills; that he promised to pay these bills when presented, but was unable to do so.    Witness further testified, that a great portion of the goods specified in the bill of particulars, being then a part of the stock in witness' store, were included in a general assignment of all the property, executed by Mainon & Bonnay, in July, 1840, to the defendants, for the benefit of creditors; that the defendants were the heaviest creditors.

The counsel for the defendants here rested.

His honor, the presiding judge, then charged the jury, that this case turned upon questions of law, involving the points of the liability of the defendants for the freight of these goods, and the discharge of them from such liability, if any had ever existed.    That these questions would be reserved for ulterior consideration; but that, for the purposes of this trial, he should charge the jury that the defendants were liable for the freight, unless the jury should find that an express contract was entered

Funck and others *agt.* Merian & Benard.

into by the plaintiffs to look to Mainon & Bonnay for the same, and to absolve the defendants from the obligation in the premises ; and with this charge, submitted the cause to the jury.

To this charge, the counsel for the defendants excepted, and the court noted the exception.

Under this charge, the jury immediately rendered a verdict for the plaintiffs, for three hundred and forty-nine dollars and sixteen cents.

The superior court, at general term, in May, 1843, overruled the bill of exceptions, and denied a new trial. The defendants brought a writ of error, and removed the judgment to the supreme court. And at the January term, 1847, that court reversed the judgment of the superior court, and awarded a new trial. (4 *Denio*, 110.) The plaintiffs thereupon brought error, and removed the judgment of the supreme court into the court of errors; and the proceedings were subsequently transferred to this court.

The cause was submitted to the court upon printed points and arguments.

*M. R. Zabriskie, attorney and counsel* for plaintiffs in error.

*First.* The consignee is the natural person to whom to look for payment of freight. And when goods have been delivered to him in accordance with the bill of lading, or the known custom of the port, he is liable. (*Kent's Com., vol. 3, p. 222, 5th ed. ; Abbot on Shipping, p.* 414, *Lon. ed. of* 1844 ; *Sanders* v. *Vanzeller,* 4 *Queen's Bench Rep., p.* 260.)

In this case, the goods were delivered into public store on general order to discharge the ship. Such order was compulsory upon the plaintiffs, and delivery under it to the government, after the bill for the freight had been rendered, and without notice that defendants were not responsible for the freight, was *a delivery to defendants.* (*Laws of U. S.* 1799, *ch.* 128, §§ 23, 25, 36, 49, 53, 56, 62.)

*Second.* The bills of lading were not endorsed over by de-

fendants, until after a part of the goods had been for several months in the public warehouses. During all this time the defendants were the owners of the goods, and as such bound to pay the freight.

They can only be discharged from the payment by showing:

1. That they refused to receive the goods, and gave notice of such refusal to the plaintiffs.

2. That an express contract was entered into, to discharge the defendants from their liability.

In the United States, the master cannot enter goods in his own name, and thus preserve his lien for freight. (*Harris* v. *Dennie*, 3 *Peters*, 293.)

On the 24th of September, 1839, the plaintiffs received on board the packet ship Baltimore, in the port of Havre de Grace, in France, nine bales, containing willow baskets, for which the master signed the usual printed bills of lading, (*pp.* 10 *and* 11 *of the case*,) filled in with the names of the defendants as the consignees.

The nine bales arrived in due course, and soon after, Mr. Turneure, the collecting clerk of Messrs. Boyd & Hincken, the agents of the ship, called on the defendants to collect the bill for the freight. This bill contained charges for freight of other goods consigned to defendants by the same vessel. Instead of paying it, they requested the clerk to separate the bills ; that is, to make out separate bills against different parties, for various portions of the articles consigned to defendants—a very customary thing, it appears, to be done in such cases, and " done more frequently for the defendants than for any other house in New-York." (*Page* 12.)

A bill for the nine bales of baskets was accordingly made out against Mainon & Bonnay.

It does not appear that any request was made to plaintiffs, to collect the amount of the bill from Mainon & Bonnay ; nor does it appear that the bill, or a copy of it, was left with defendants that they might collect it. They, however, on the 22d November, 1839, (p. 14,) paid for the freight of so much

Funck and others *agt.* Merian & Benard.

of the goods consigned to them, as was not included in bills which they had asked to have made out against others.

On the 15th of January, 1840, plaintiffs received on board the same ship, at the same port, ten other bales of willow baskets, shipped by the same person in Havre, and consigned to the defendants. (*Bill of Lading, p.* 11.)

The same circumstances occurred with regard to this consignment. Plaintiffs presented their bill. Defendants asked to have it separated, (into how many does not appear,) and that a bill for these ten bales might be made out against Mainon & Bonnay. It was done. On the 3d April, 1840, defendants paid plaintiffs $107.90, "for freight per Baltimore, from Havre." The receipt was not "in full."

The bills against Mainon & Bonnay, as a matter of politeness to defendants, were presented to them, and they promised to pay them ; but afterwards refused to do so : and when the clerk presented the bills again to the defendants, they refused to pay them, and set up that they were not the owners of the goods, and were therefore not responsible for the freight.

The goods belonged to the manufacturers, in France. (*Bonnay's testimony, p.* 14.)

The first lot was sold by defendants, as the manufacturers' agents, to Mainon & Bonnay, on the 22d February, 1840, as appears by the endorsement on the bill of lading, (*p.* 11,) five months after the time of shipment.

The endorsement of the bill of lading of the second lot has no date.

Until the endorsements of the bills of lading, the title of the goods was in defendants.

As naked consignees, they were primarily liable to pay the freight. (*Kent's Com., vol.* 3, *p.* 222, *5th ed.*)

Mainon & Bonnay, as purchasers from them, were not liable. (*Artaza* v. *Smallpiece,* 1 *Esp. N. P. C.* 23 ; *cited and approved by Kent.*)

The goods were carried and delivered on the credit of the defendants ; they, having given no notice that the plaintiffs

must look to their lien for the freight, by construction of law received them, and are liable on this ground.

They also received them, in fact, (a great part, if not the whole of them,) in July, 1840. (*Bonnay's testimony, p.* 15.)

This suit was not begun until November, 1841.

*F. Dominick, attorney and counsel* for defendants in error.

*First.* A consignee of merchandize by a general ship, where there is no charter party, is not responsible for freight nakedly as consignee ; but a receipt of the goods is requisite in order to create a liability. (*Cock* v. *Taylor,* 13 *East. R.* 399 ; *Trask* v. *Duval,* 4 *Wash. C. C. R.* 184.)

*Second.* Where a consignee endorses a bill of lading, the ·assignee becomes the appointee of the original shipper, to receive the goods ; and if the goods be received by him, he is the only party liable for the freight. (*Tobin* v. *Crawford,* 5 *Mees. & Wels.* 235 ; *same case affirmed in Exch. Chamber,* 9 *Mees. & Wels.* 716.)

The charge of the judge, therefore, that the defendants in error were liable as consignees, notwithstanding they had endorsed over the bill of lading to parties who received the goods, is erroneous; and that decision was properly reversed by the supreme court.

*Argument.*—I shall only refer to sucn facts as have not been stated ; or, as I conceive, have been misapprehended by the opposite counsel.

After the separation of the bills for freight, and the payment by the defendants of the freight on their own goods, it appears (*pp.* 14 *and* 15,) that those made out to Mainon & Bonnay were *frequently* presented, payment promised, *never refused,* but postponed ; and credit given until they finally failed.

It does not appear that notice was ever given to the defendants of any claim, until by this suit, after the lapse of two years, in November, 1841.

The testimony of Bonnay (*p.* 14,) shows that the property was always owned by, and at the risk of Mainon & Bonnay ;

and that the defendants had no interest in it ; and the bills made out to the defendants, for freight on their own goods, (*p.* 13,) and the receipts therefor, (*p.* 14,) and the course of the agent with respect to the bills for the freight now claimed, prove that he understood that Mainon & Bonnay were the owners of the goods, and alone liable for freight.

The counsel for the plaintiffs in error "appears to concede the well established principle, that a receipt of the goods is necessary to fix a liability upon a consignee, for freight ; but he contends that a deposite in the public store is equivalent to a delivery.

Now, supposing this to be so, how would he overcome the effect of the fact, to which he has not adverted, and which appears from the admission, (*p.* 10,) that five bales of the last lot were delivered to Mainon & Bonnay *from the ship*. That firm must already, under the act of congress, have made the entry as owners, covering the other five bales of the same lot subsequently sent to the public store.

Here then was no delivery to the defendants, either actually or constructively, according to the argument of the counsel, if sound ; and still, the freight on these ten bales is included in the verdict ; and the charge of the judge of which we complain was, that the defendants were liable for the whole freight.

The law of the case, as I understand it, is this :

On the shipment of goods under a bill of lading, the contract of the shipowner is with the shipper alone ; and it was originally held that this was the only party against whom recourse could be had.

It was not until 1790, that it was held that the consignee could be in any case made responsible ; and his liability was then put upon the express ground that, *by the receipt of the goods*, an implied promise to pay freight was raised, such payment being the condition upon which the goods were to be delivered.

When the consignee endorses over the bill of lading, no privity arises between himself and the shipowner—he subtitutes another appointee of the shipper, who has the same right to

receive the goods on the payment of freight; and whose receipt raises an implied promise on his own part to pay freight; and if the goods are delivered to, or received by the assignee of the bill of lading, without such payment, there is still no foundation for any obligation on the part of the consignee. His endorsement does not create the assignee his attorney or agent to receive the goods; it does not authorize a pledge of his credit for the freight, nor is he responsible on the naked endorsement, as in the case of promissory notes and bills of exchange.

The cases of *Artaza* v. *Smallpiece*, and *The Theresa Bonita*, holding that the assignee is not responsible for freight, are expressly overruled in *Cock* v. *Taylor;* and the doctrine of the last case is fully supported in *Trask* v. *Duval*. Chancellor KENT, in his collection of authorities on questions of freight, states the decision of *Artaza* v. *Smallpiece*, but without comment or approval. The case of *Tobin* v. *Crawford* establishes that where the bill of lading has been endorsed, and the goods received by the assignee, the consignee is not responsible. These cases are on the points.

In this case, the deposit of a portion of the goods in the public store, created no privity between the shipowner and the defendants; it was not a delivery to them, it was not the act of consignees, nor does it destroy the lien of the master: for it was not *a voluntary delivery*. The act of congress was not intended to disturb the relations among parties in respect to ownership of, or liens upon property, but nakedly to secure the rights of the government.

The storekeeper becomes the legal custodian of the property; he represents the interest of all parties. When the permit is given, that merely certifies that the duties are paid; and should the master have interposed a notice of his lien for freight, we believe this could not have been safely disregarded; an injunction would certainly have protected the ship-owner's rights.

Whether or not, however, the act of congress takes away the lien of the master, it is sufficient for us to say, that it does not

make such deposit equivalent to a delivery to the consignee; nor does it create any new liability not known to the common law on his part. In this case, the goods were actually received by others; there is therefore no foundation for a liability on the part of the consignees.

Here, then, Mainon & Bonnay received a portion of the goods from the ship, the balance from the public store, no measures being taken by the master to preserve his lien. They were the owners of the goods, they promised to pay the freight, they never refused, their course of business was well known to Mr. Boisgerard, one of the plaintiffs; finally they failed, and after two years, without previous notice, this claim is set up against the defendants, who had no interest, and had done no other act than nakedly to endorse a bill of lading, transferring the authority to Mainon & Bonnay to receive the goods *on payment of freight.*

*Reply.*—The defendant's counsel is mistaken, in supposing that any credit was given to Mainon & Bonnay, by the plaintiffs.

It does not appear affirmatively in the case; nor is it true, in fact; nor can it be fairly inferred from the circumstance of the plaintiffs presenting them with a bill. The bill was presented only at the defendants' request, and as a matter of politeness to them; and although Mainon & Bonnay did promise to pay it, yet that did not raise an assumpsit on their part, being without consideration as between the plaintiffs and them; much less did it operate to release any responsibility on the part of the defendants.

Nor can any inference, unfavorable to the plaintiffs, be made from the fact of this suit not having been commenced until sixteen months (not two years, as stated by the counsel,) after Mainon & Bonnay's failure, and the return of the goods by them to the defendants. On the contrary, if the counsel had inferred that, during all this time, the plaintiffs, by their agents, were reasoning with the defendants, and endeavoring to induce them by gentle means to pay the demand, he would have been much nearer the truth.

Again, I do not see how the counsel can infer from Bonnay's testimony, that he and his partner were the owners of the goods, when it directly appears that the goods were sent to the defendants as the agents of the manufacturer in France; to be held by them until they were paid for. (*Page* 15.)

To maintain, under such a state of facts, that the defendants were mere naked consignees without interest; and to endeavor to apply to them the principles of law, applying to mere naked consignees, seems to me, with due deference to the opinion of the court below, a proposition somewhat difficult to establish.

But even granting, for the sake of the argument, that it was so ; granting that the goods had been shipped to them from Europe, without their knowledge, and by persons entirely unknown to them ; I still contend, that under the circumstances, they would have been liable, on the ground of their neglect to *inform the plaintiffs* of the true state of the case. It was a *suppressio veri*, and justified the plaintiffs in delivering the goods to another party, under the belief that the defendants would pay the freight.

They were the consignees on the bill of lading, and, as such, the persons to whom the carrier was naturally to look for the freight. They were *prima facie* responsible, and that responsibility could only be relieved by some action on their part; such as giving notice that they were not the owners of the goods, *and did not consider themselves responsible.*

They knew perfectly well that Mainon & Bonnay were persons of no standing and credit, and that the plaintiffs would not have delivered the goods, if they had known that they must look to them only for the freight.

It was in the power of the defendants to have protected the plaintiffs, while the goods were yet in the ship, by disclosing the true state of the facts ; they had repeated opportunities to do so, as regards both shipments, and it was their duty to have done so ; as much so as it was their duty to protect their principal in France, by withholding the goods until they were paid for them.

Having omitted to do so, if they really sold the goods to

Funck and others *agt.* Merian & Benard.

Mainon & Bonnay, without adding the freight to the price, (as is customary in such cases, and as they ought to have done;) it is their misfortune, and should not be visited on the plaintiffs, who are free from all blame, and who only acted, in allowing the goods to go to the public store, in obedience to the law, and in accordance with the usage and the well known custom of the port.

They certainly are innocent in the premises; they have earned their money, and if this judgment goes against them, will be without redress. The defendants, on the other hand, may have already received the freight in the price of the goods when they sold them. There is nothing to contradict such an inference in the case. At all events, they probably protected themselves out of the goods when returned to them by Mainon & Bonnay, under the general assignment made by them to the defendants.

And if they are still losers, they have their remedy over, unless the loss was incurred by negligence on their part, against the manufacturer in France; a remedy which is entirely debarred to the plaintiffs, as they do not even know his name or place of residence. The defendants acted as his agents, and were, no doubt, paid for their services. In the performance of their duties to him, they suffered the goods to go into public store, and to remain there (a part of them) for three months.

During all this time, to whom did the goods belong?

Certainly not to Mainon & Bonnay. If they had been destroyed by fire, the loss would not have fallen on them; but on the manufacturer; and the defendants, as his agents, would have been culpably negligent if they had not kept them insured; the goods were under their power and control; they had duties to perform in relation to them, to the government, and to others, as well as to their principal.

If they have failed in any of those duties, they must pay the penalty. Their situation is similar to that of the drawee of a bill of exchange, to whom it has been presented for acceptance, and who refuses to accept or to return it.

Funck and others *agt.* Merian & Benard.

He makes himself liable even if the bill have been drawn on him without authority.

In this case, the defendants' name was not used without their consent; and the bills of lading, one of them at least, was kept by them for more than three months, and then endorsed over. Both of them were regularly endorsed. Here was a recognition of the defendants' agency, an acknowledgment, in writing, of their interest in the goods of such a nature as utterly does away with the idea of their being mere naked consignees.

The counsel alludes to the admission, in the case, that five of the bales, in the last shipment, were delivered to Mainon & Bonnay out of the ship ; and he says, that if this be so, then, under the act of congress, the whole of the last invoice must have been entered by Mainon & Bonnay, as owners, previously to the delivery.

But it is also admitted, that the other five bales of this shipment went into public store, " *on general order.*" (*Page* 10.)

Now, the only object in sending goods into the public store, is to protect the government in the collection of the duties; duties cannot be paid on a part of an invoice, and left unpaid on part. If a part went into public store, another part could not have been delivered to Mainon & Bonnay. The admission in the case must, therefore, have been made in error.

But, be this as it may—

The five bales, if delivered to Mainon & Bonnay, were not delivered by the plaintiffs, but by the government. The government, by its officers, takes charge of every cargo, and the master has no manner of control over the delivery. The course is for the collector, after the duties are paid, to send down his orders to his officer, having the custody of the cargo, to deliver it to the parties who have produced to the collector the proper evidences of title, and paid the duties. The order is called a permit. Such an order must have been produced to the inspector on board, by Mainon & Bonnay, before he delivered to them the five bales, (if he did deliver them.)

But even if the five bales were delivered, according to the argument of the opposite counsel, the plaintiffs still retained

their lien for the whole freight on the remaining five which went into public store. The defendants knew that they were taken there on the 26th of March, (*p.* 10.) On the 3d April, following, (*p.* 14,) they paid their bill for the freight of the other goods received by them on the voyage. Here was another chance for them to warn the plaintiffs to make an attempt, if they did not expect to pay it themselves, at least to secure them their money. But, as on the former occasions, nothing fell from them.

Now, with regard to the cases; putting out of view *Artaza* v. *Smallpiece,* (1 *Esp. R.* 23,) which I still believe to be law, notwithstanding the doctrine in *Cock* v. *Taylor* to the contrary; it is submitted that they do not warrant the inference, which seems to have been adopted by the court below, that it is the *receipt* of goods alone which determines the liability to pay freight.

In *Wilson* v. *Kymer,* (1 *M. & S.* 157,) the defendants were endorsees of the bill of lading. The goods went into the dock company's stores, and defendants afterwards received them out of store *on the order of the consignees.*

(It does not appear if the order was on the bill of lading, or on a separate piece of paper. In the case before the court, it was on the bill of lading.)

It was held that the defendant was not liable, because he had not received the goods under the bill of lading, but on the order.

He was, however, held liable on another ground.

In *Scarf* v. *Sir John Tobin,* (3 *Barn. & Adol.* 523,) defendant was the consignee by name, but was held not liable for general average, though he had received the goods with notice of the claim.

In *Sanders* v. *Vanzeller,* (4 *Q. B. Rep.* 260,) defendant had purchased a cargo of wool from the consignee, paid part of the purchase money, and stipulated in writing to pay the balance, and the freight. He afterwards refused to pay, on the ground that the article was not according to sample; but, nevertheless,

Funck and others *agt.* Merian & Benard.

he received the wool and sold it for his advances.   He was holden not liable for the freight.

*Ward* v. *Felton*, (1 *East*, 507,) is another case in point.

In all the cases cited *contra*, and referred to by the court below, (with the exception of *Trask* v. *Duval*,) *there was no consignee named;* the bill of lading being to "order."   This is always considered enough to put the master on inquiry.   It is a suspicious circumstance.   It is very different, when a well known name appears on the bill of lading.   Among hundreds of packages arriving in the New-York packets, there are very few shipped "to order."

In England, the shipper alone, prior to 1790, was holden liable for freight.   Afterwards, the consignee, as well as the shipper, was holden.   And finally, for the convenience of trade, and to favor the ship owner, and not the consignee, it was holden that the receiver of the goods, under the bill of lading, was also liable.

*Cock* v. *Taylor*, (13 *East*, 399,) is, perhaps, the earliest reported case maintaining this doctrine.   It was a case of goods shipped on board a vessel, bound to London, by Montgomery & Co., at Alicante, to the order of Hargreaves & Co., of Algiers.   The bill of lading was endorsed by Hargreaves & Co., to Peters, of Gibraltar; and by Peters again endorsed to Taylor & Son, of London, who received the goods.

It was right that Taylor should pay.   It would have been very unjust to have sent the master back to Algiers, and all round the globe to get his due.

If the defendant had colluded with the shippers to cheat the master, it was right that he should pay.

If he was an innocent purchaser, he was still liable; because, under the circumstances, it was his duty to see that his title was clear, before he paid his money.   There was enough to put him on inquiry; as there was also in the case before the court.

In *Trask* v. *Duval*, (4 *Wash. C. C. R.* 180,) the captain refused to deliver the goods to the consignee, unless the freight was first paid.   The defendant then came forward and agreed,

Funck and others *agt.* Merian & Benard.

that if the consignee did not pay, he would ; and he took an assignment of the bill of lading, and received the goods and sold them.

The court held him liable for the freight on his *promise* to pay it.

In *Tobin* v. *Crawford*, Coupland & Duncan, who received the goods at London, where they were unladen, (the defendant did not live there,) were represented to be the agents of Crawford. But the court was not satisfied that such was the case. (5 *Mees. & Wels.* 239, PARKE, J.)

And lord ABINGER expressly puts the decision on the ground, that the credit was not given to the defendant, but to Coupland & Duncan, the *plaintiff having charged them in his books with the freight.*

In all of these cases, the decision was according to the substantial justice and equity of the case ; and it would be rather a singular spectacle to see the courts of this country, where, in many respects, strange as it may sound, the law is much less favorable to commerce than it is in England, measuring out the strict measure of technical law in every case, without any regard to its peculiar characteristics.

In England, the master, where freight is unpaid, can enter the goods in his own name, and so collect what is due him.

All the American authorities assert that it can be done here ; *but it is not so.*

It never has been done in practice, and there is nothing in the laws of congress allowing it to be done.

So in England, and on the continent, where goods are invoiced too low, with a view to defraud the government in the duties, the goods are not seized and confiscated as with us, but the government takes them from the importer at ten per cent. over his valuation, and pays the freight. With us, the government officers will not take any notice of a claim put in for freight on goods while in the public stores. It is not so in England. In this country, it is even doubtful if the government officials would be bound by an injunction out of the state

courts, or be in any way subject to the operation of state laws. (*Harris* v. *Dennie*, 3 *Peters*, 303.)

But granting that they are liable, and granting that in a case like the present, the consignee is not ; it amounts then to this : That every owner of a packet ship must stand ready, on every arrival of his ship, with a stereotyped bill in chancery and injunction, to plaster on every single case of goods which has not been "permitted," within fifteen days after arrival. If this be so, and if the consignee can relieve himself from all liability, by assigning over his bill of lading, perhaps to a fictitious person, perhaps to one living in Chicago, or in Seringapatam, (and that person can again assign it over *ad infinitum,*) then we shall require a new judiciary act, and some hundreds of new elective judges, with equity powers to hold their chambers, perhaps, in the corners of the merchants' warehouses, and their courts on the ends of the piers.

The happy effect of such a state of things on commerce, and on the community at large, may well be conceived.

We have done well heretofore, under the general belief, among merchants, that "the consignee is primarily liable for the freight," (as the late Mr. Chancellor KENT expresses it.) I entreat the court to beware how they overturn this ancient doctrine. This case is a test case ; it is not an action brought to recover a few hundred dollars, but to settle a principle ; as such, the decision of the court of last resort is anxiously looked for, particularly by those who, from the peculiar nature of their carrying trade, are most interested—the owners of the packets sailing from the port of New-York.

One word more ; with regard to the mention made by defendants' witness, Bonnay, of Mr. Boisgerard, one of the plaintiffs, and the allusion to him by the counsel at the close of his argument.

Mr. Boisgerard is a Frenchman by birth, though naturalized here, having received his mercantile education in this city, some thirty years ago. He is a merchant at Havre, and has not been in this country for twenty years, (as I am credibly informed.) It may be that he has an agency in this city, but I

Funck and others *agt.* Merian & Benard.

have no hesitation in saying, that he personally knows nothing of Mainon & Bonnay, or of their affairs; and also, that he is utterly ignorant of the facts of this case, and of all the details of the business of the ship Baltimore.

DECISION—*Judgment affirmed.* For affirmance—JEWETT, Ch. J., BRONSON, GARDINER, WRIGHT, RUGGLES and JOHNSON, JJ. For reversal—JONES and GRAY, JJ.

NOTE.—As there does not appear to be any written opinion by this court, it is presumed they adopted the opinion of the supreme court, (4 *Denio*, 110,) JEWETT, justice, which *held*,—That the obligation to pay freight rested on the bill of lading, by which its payment was made a condition of delivery to the consignee or his order. The master was not bound to part with the goods until the freight was paid; but did not, by delivering the goods before payment, waive or discharge his legal right to demand payment of the person who, by the principles of law, was primarily liable to pay.

It was well settled, that when the goods, by the terms of the bill of lading, are to be delivered to the *consignee or to his order* on payment of freight; the party *receiving* them, whether the consignee, or endorsee, to whom the bill of lading has been transferred by the consignee, makes himself responsible for the payment of the freight. The law implies a promise on his part to pay the freight; such being the terms on which, by the bill of lading, the goods were to be delivered. By the act of accepting and receiving, the party makes himself a party to the contract.

In this case, the goods were consigned to the defendants, *or to their order* They endorsed the bills of lading, and ordered a delivery to Mainon & Bonnay, to whom the goods were delivered. *They,* and *not* the defendants, were therefore bound to pay the freight.